IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 6, 2021

**STATE OF TENNESSEE v. MARCEL HOLBROOK**

**Appeal from the Criminal Court for Shelby County**
No. 17-05939          James M. Lammey, Jr., Judge
_____

**No. W2019-02202-CCA-R3-CD**
_____

A Shelby County jury convicted the Defendant, Marcel Holbrook, of first degree premeditated murder, attempted first degree murder, and possession of a firearm during the commission of or attempt to commit a dangerous felony. The trial court imposed an effective sentence of life plus twenty-seven years. On appeal, the Defendant asserts that the trial court erred when it admitted into evidence a photograph of an SKS rifle and that the evidence was insufficient to support his convictions for first degree murder and attempted first degree murder. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Shae Atkinson, Memphis, Tennessee, for the appellant, Marcel Holbrook.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; Stephanie Z. Johnson and Ryan E. Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a shooting that occurred in the Klondike area of Memphis, Tennessee. The shooting resulted in the death of Duncan Hardy and serious injuries to Anthony Edwards. For his role in the shooting, a Shelby County grand jury indicted the Defendant for first degree premeditated murder, attempted first degree murder, and possession of a firearm during the commission of or attempt to commit a dangerous felony.

The parties presented the following evidence at trial: On November 8, 2017, Memphis Police Department ("MPD") Officer Anthony Williams responded to a call about gunfire "in the area of Alaska and Vol[li]ntine," in the Klondike area. Police dispatch received reports of gunfire in this area and also a short distance away on Annie Place. In front of a residence on Annie Place, police officers located a grey Hyundai Elantra that had been involved in a shooting. The Hyundai was positioned partially on the sidewalk and partially in the street with the motor still running and a liquid was leaking from underneath the car. Officer Williams observed multiple bullet holes in the body of the car and a bullet hole in the front windshield. Officer Williams approached the residence that the car was in front of and saw blood on the steps leading to the door. He knocked on the front door with no response.

Officer Williams's partner, Samuel Strickland, called Officer Williams over to the Hyundai where Duncan Hardy was slumped down in the front passenger seat and unresponsive. Officer Williams observed a visible gunshot wound to Mr. Hardy's head. While waiting for an ambulance to arrive, Officer Williams and Officer Strickland set up a crime-scene perimeter to protect any potential evidence. As they did so, a woman approached them identifying herself as the sister of the Hyundai's driver, Anthony Edwards. She explained to the police that her mother had transported her brother to the hospital.

Another officer at the scene, MPD Sergeant Adam Pickering, found auto glass at the intersection of Alaska and Vollintine, a trail of fluid leading off to the west in the middle of Vollintine, and numerous shell casings. The fluid led all the way down the street to where the Hyundai was found on Annie Place. As to the shell casings, Sergeant Pickering reported finding twenty-four 7.62 by 39 shell casings.

MPD Officer Robin Bass first reported to Annie Place, a residential area that intersects Vollintine. She identified the intersection of Vollintine and Alaska as the "secondary scene." She observed "bullet defects" on the front windshield and hood of the Hyundai. The bullet defects on the hood were consistent with bullets entering the hood. She also described the bullet defects on the passenger-side window and along the side of the Hyundai as entry defects. Inside the vehicle she observed shattered glass throughout, indicating that glass flew inside the vehicle due to a bullet's entry into the window. She noted that all of the car windows were shattered. She observed bullet holes across the vehicle, which indicated that the Hyundai drove past the shooter as he was firing the gun. Officer Bass recovered marijuana and cocaine from the driver's side of the Hyundai. She also recovered five forty-five caliber spent shell casings, cell phones, and a bullet fragment. Officer Bass believed the forty-five caliber shell casings were fired from the Hyundai.

When Officer Bass moved to the secondary scene at Vollintine and Alaska, she observed a fluid trail in the street, spent shell casings, and bullet fragments. She stated that the majority of the twenty-four shell casings collected were found on Alaska. Officer Bass confirmed that the shell casings were consistent with the type of ammunition used in an assault rifle. Officer Bass also noted shattered glass, consistent with the Hyundai windshield, in the road.

Dr. Katrina Van Pelt testified as an expert witness in the field of forensic pathology. Dr. Van Pelt conducted the forensic exam for this case in November 2017. Dr. Van Pelt observed multiple abrasions to Mr. Hardy's face and found multiple gunshot wounds to his body. Dr. Van Pelt reported finding ten entrance gunshot wounds and four exit wounds with several of the wounds possibly being fatal. Mr. Hardy sustained gunshot wounds to the head, arm, abdomen, leg, and chest, damaging his brain, heart, lungs, humerus, esophagus, fibula, bowel, spine, and liver. Based upon her examination, she determined that the cause of death was multiple gunshot wounds.

Anthony Edwards, the driver of the Hyundai Elantra, lived in the Klondike neighborhood at the time of these events. Mr. Edwards drove his girlfriend home at around noon in his gray Hyundai and then drove to his mother's house on Annie Place. After leaving his mother's house, he drove down Olympic Street when he received a phone call from Duncan Hardy, who asked Mr. Edwards to "pick him up on Watkins." Mr. Edwards recalled that he drove to the location to meet Mr. Hardy at 1:00 p.m. After Mr. Hardy got into Mr. Edwards's car, Mr. Edwards made a U-Turn on Watkins and drove to Vollintine to sell drugs to the resident of a house located on the corner of Alaska and Vollintine. Mr. Edwards parked and waited outside the residence.

As Mr. Edwards waited for the resident to come outside and buy drugs from him, he saw a black Pontiac G6 pull over to the side of the road. He returned to scrolling through Facebook on his cell phone until Mr. Hardy cried out suddenly. Mr. Edwards looked up and saw the Defendant exiting the black Pontiac G6 wearing a "hoodie hat" and carrying a long, black assault rifle. Mr. Edwards accelerated his vehicle, and the Defendant began firing on Mr. Edwards's Hyundai. Mr. Edwards stated that he returned fire as he continued to drive away. He recalled that he only fired once and then threw the gun out the car window on Vollintine "in between the bus stop and Olympic." He drove to his mother's house on Annie Place, parked, and knocked on her front door. Mr. Edwards did not realize that he had been shot until his mother answered the door and said, "You shot?" She then asked who shot him, and Mr. Edwards identified the Defendant as the shooter. Mr. Edwards's mother drove him to the hospital.

Mr. Edwards testified that he "didn't really know" the Defendant because Mr. Edwards had been in prison when the Defendant and his cousin had "their feud." Mr.

Edwards stated that he had seen the Defendant's G6 behind him on Olympic before he picked up Mr. Hardy. He recalled that the G6 was following him closely. He pulled his car over, and the G6 drove past him slowly.

MPD Sergeant Erik Jensen obtained a typed statement from Mr. Edwards on November 25, 2017. Mr. Edwards named the Defendant as the shooter and identified the Defendant in a photographic lineup. Officers attempted to locate the Defendant to speak with him and, when they could not, Sergeant Jensen obtained an arrest warrant on December 6, 2017, for the Defendant. After the police received a tip on the Defendant's location, officers arrested the Defendant on January 23, 2018.

MPD Officer[1] Samuel Strickland participated in the January 23, 2018 execution of the arrest warrant for the Defendant. When he arrived at the location, he observed a silver/gray Volkswagen consistent with the vehicle associated with the Defendant at that time and the Defendant attempting to enter a locked residence. Officer Strickland, dressed in an MPD uniform, called out to the Defendant that he wanted to speak with the Defendant, and the Defendant fled. Several officers pursued, ordering the Defendant to stop. As the Defendant ran, he tripped and fell onto the grass, providing the officers the opportunity to apprehend him. Officers transported the Defendant to the Homicide Office where Sergeant Jensen spoke with the Defendant. After waiving his *Miranda* rights, the Defendant denied any involvement in the shooting. He explained that he was "high" on November 8, 2017, and had no memory of that day. The Defendant admitted driving a black Pontiac G6 but stated that the vehicle had broken down, and he no longer knew where it was located.

Later, the Defendant initiated further discussion about the case with Sergeant Jensen. On March 14, 2018, Sergeant Jensen again met with the Defendant to discuss the shooting. This time the Defendant told Sergeant Jensen that he was driving a black Pontiac G6 when he pulled off the road and parked to speak to Mr. Edwards who was in the driver's seat of a grey Hyundai. The Defendant said that he did not have an issue with either of the men in the Hyundai but that he had a "beef with one of their cousins." The Defendant told Sergeant Jensen that Mr. Edwards and Mr. Hardy had "been known to carry guns," so he carried a gun as he approached the car. He announced to Mr. Edwards and Mr. Hardy that he only wanted to talk to them, but Mr. Edwards fired a gun at him so the Defendant returned fire.

Sergeant Jensen testified that the Defendant stated that he was approaching the passenger side door where Mr. Hardy was seated when Mr. Edwards began shooting out the closed passenger window from the driver's seat and "struck" Mr. Hardy in the back of

---

[1] At the time of trial, Samuel Strickland worked at the Tennessee Bureau of Investigation. For purposes of consistency and clarity, we will refer to him by his title at the time of these events.

the head. The Defendant did not know how many shots he fired because he "[l]ost control of the rifle" when he returned fire. He described Mr. Edwards's car as "creeping forward" as Mr. Edwards continued shooting. The Defendant returned to his vehicle and drove away. The Defendant told Sergeant Jensen that he later contacted his cousin, Darren Tony, and told him to "come get" the car and rifle. The Defendant denied any knowledge of what his cousin did with the car or the rifle. The Defendant also denied any gang affiliation.

TBI Special Agent Kasia Lynch testified as an expert witness in the field of firearms and bullet identification. Special Agent Lynch analyzed bullets, bullet fragments, five .45 auto caliber cartridge cases, and twenty-five 7.62 by 39 millimeter caliber cartridge cases recovered in this case. After examining the twenty-five 7.62 by 39mm cartridge casings, she determined that they had all been fired from the same firearm. Although no guns were submitted in this case, she explained that the 7.62 by 39 millimeter caliber cartridge cases were more commonly used in a semi-automatic gun. Some of the bullets and bullet fragments recovered from Mr. Hardy's body had no marks preventing Special Agent Lynch from making any type of comparison; however, six of those recovered had markings and were in the "thirty caliber class," which included a 7.62 by 39 millimeter caliber bullet. Special Agent Lynch confirmed that the five .45 caliber cartridge cases found inside the Hyundai had all been fired from the same firearm.

Special Agent Lynch testified that she was familiar with SKS rifles and that an SKS rifle typically fires 7.62 by 39 millimeter ammunition. The State showed Special Agent Lynch a photograph that she described as "pretty representative of an SKS rifle." The Defendant objected, and the trial court overruled the objection finding that the photograph was probative and relevant to the case. Special Agent Lynch testified that an SKS rifle typically held thirty rounds of ammunition. She confirmed that twenty-five bullets could have been fired from one magazine in this type of weapon.

The State concluded its case against the Defendant, and the Defendant elected to testify. The Defendant recalled the events of November 8, 2017, leading up to the shooting. After attending school at Tennessee Tech, the Defendant went to his grandmother's house at around 3:30 p.m. While at his grandmother's house, the Defendant called his uncle to ask about borrowing money. Following this conversation, he drove to his uncle's house in the Klondike area. Due to prior hostile interactions with Mr. Edwards's cousin, the Defendant put a gun in his car before traveling to this area.

As the Defendant drove to his uncle's house, he observed Mr. Edwards parked in front of a house on the corner of Vollintine and Alaska. The Defendant explained that he did not "like being into it with nobody" so decided to "get it over with." He pulled his car to the side of the road, believing that the act of exiting his car and approaching the men was "like a gesture" indicating a desire for a peaceful resolution. He took the gun off the

back seat of his car, put the gun under his arm then raised his hand to wave at Mr. Edwards and Mr. Hardy to show them that he was putting the gun back in the car "like a peace offering." As he held the gun under his arm, the gun slipped, and the Defendant fell trying to catch the gun. As this occurred, Mr. Edwards fired at him. After Mr. Edwards fired his gun at the Defendant, the Defendant returned fire. The men continued firing their guns at one another as Mr. Edwards's Hyundai "creeped past" the Defendant. When the gunfire ceased, the Defendant was stunned and fearful. He got into his car and fled the area.

The Defendant drove around and finally parked in an area near his grandmother's house and cried. He explained that the shooting "was the last thing [he] wanted to happen." He called his cousin and told him to come and get the Defendant's car, and the Defendant walked to his grandmother's house before returning to his home in Whitehaven.

The Defendant explained that he did not have a conflict with Mr. Edwards but with Mr. Edwards's cousin, "Pat." The Defendant attempted to resolve the issue through Mr. Edwards because Mr. Edwards and his cousin "r[a]n together." The Defendant had hoped that Mr. Edwards might convey to his cousin the Defendant's desire for a peaceful resolution. The Defendant stated that he did not contact the police out of fear and because his mind "was going a hundred different ways." He acknowledged that he was not initially truthful with the police when he met with them in January. With time, he realized that he needed to tell the truth because someone had died. The Defendant maintained that he only fired his gun because Mr. Edwards first fired at him. He explained he only had the gun with him because the Klondike area was dangerous and he had previously experienced "conflict in that area."

On cross-examination, the Defendant testified that he did not live in the Klondike area but knew it to be a dangerous area. He confirmed that Mr. Edwards's cousin had shot at him in 2015 when he had been in the Klondike area but he never notified police of this prior shooting. The Defendant confirmed that the shooting at issue occurred two years after he had the 2015 interaction with Mr. Edwards's cousin. He reiterated that he had no issue with either Mr. Edwards or Mr. Hardy; however, he thought it was a good time to resolve any issues he had with Mr. Edwards's cousin through Mr. Edwards.

The Defendant recounted the events leading up to the shooting again, saying that he noticed Mr. Edwards's Hyundai as he was driving down Vollintine. He made a U-turn in front of Mr. Edwards's car and turned onto Alaska and parked. He exited his vehicle, waved at Mr. Edwards, and then retrieved the gun from the backseat of his car. At this point Mr. Edwards fired a gun at him. The Defendant admitted that he could not see Mr. Edwards, but he explained that he knew Mr. Edwards fired the gun because he heard the gunshot coming from the Hyundai. The Defendant then added that Mr. Hardy fired a gun too. Even though the Defendant had told the police that all the car windows were up, he

maintained that the gunfire came from inside the Hyundai; however, he admitted he could not see from where the gunfire came. He stated that his gun was not loaded, but he chambered a round and began firing. The Defendant denied knowing where he was shooting, claiming that he was scared and "just got to shooting." The Defendant agreed that he fired at the front of the Hyundai repeatedly and then shot along the Hyundai's side door panel. He agreed that as Mr. Edwards drove by him he "follow[ed]" the Hyundai with his rifle while shooting. The Defendant admitted that the rifle he used was similar to the rifle depicted in the photograph shown to Special Agent Lynch.

On redirect, the Defendant testified that, during the time between the 2015 shooting and the present shooting, there were "a few verbal altercations, and they shot at me and had some people shoot at me."

Based upon this evidence, the jury convicted the Defendant of first degree premeditated murder, attempted first degree murder, and possession of a firearm during the commission of or attempt to commit a dangerous felony. The trial court imposed an effective term of life imprisonment plus twenty-seven years. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court should not have admitted a photograph of the type of rifle the State alleged the Defendant used during the shooting and that the evidence is insufficient to support his convictions for first degree premeditated murder and attempted first degree murder. The State responds that the photograph was properly admitted as demonstrative evidence. The State further responds that the evidence presented at trial was sufficient to show beyond a reasonable doubt that the Defendant murdered Mr. Hardy and attempted to murder Mr. Edwards.

### A. Admission of the Photograph of the Type of Rifle Used in the Shooting

The Defendant argues that the trial court admitted the photograph of a rifle in violation of Tennessee Rule of Evidence 402 because the photograph "had no tendency to make any fact more or less probable." The State responds that the trial court properly admitted the photograph of an SKS, the type of gun the Defendant admitted to using during the shooting, as demonstrative evidence and that the Defendant has failed to show how he was prejudiced by this photograph. We agree with the State.

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id*. Relevant evidence is

defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. at 403. The admissibility of evidence under Rule 403 is "a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of discretion." *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

At trial, the State sought to introduce a photograph of an SKS rifle of the type the Defendant had admitted using during the shooting. The Defendant objected, and the trial court allowed the State to introduce the photograph through TBI Special Agent Kasia Lynch, who testified as an expert witness in the field of firearms and bullet identification. Agent Lynch used the photograph to identify the magazine of the weapon and explain its capacity. She stated that an SKS rifle could easily fire from one magazine the twenty-five rounds that were recovered from the crime scene. The Defendant disposed of the weapon after fleeing the scene, so the actual gun was not available at trial. The State had the burden of showing that the Defendant acted with premeditation and, therefore, evidence that multiple shots were fired at the victims was relevant and illustrative of a fact in issue. Furthermore, the Defendant claimed that he started firing only in self-defense after Mr. Edwards began shooting at him. We agree with the State that a photograph of the type of weapon the Defendant carried demonstrated the difficulty of concealing such a weapon. It also supports Mr. Edwards testimony that he saw the Defendant get out of his car with a large assault rifle and begin shooting at them before he returned fire.

Accordingly, we conclude that the trial court did not abuse its discretion in allowing admission of a photograph of the type of weapon used during the shooting. The Defendant is not entitled to relief as to this issue.

## B. Sufficiency of the Evidence

The Defendant argues that the evidence was insufficient to support the verdicts of first degree premeditated murder and attempted first degree murder. He asserts that the State failed to present sufficient evidence that he acted intentionally with premeditation and that because he acted in self-defense, the jury should not have convicted him. The State responds that there was sufficient evidence to support the jury finding that the Defendant acted with premeditation when he, armed with an SKS rifle, approached the victims and fired numerous times, killing Mr. Hardy and seriously injuring Mr. Edwards, and then fled, disposing of the weapon. The State also asserts that the jury rejected the

Defendant's self-defense claim, a decision that is within the province of the jury. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. *Id.* In this case, the State had to prove that the Defendant intentionally killed Mr. Hardy and intentionally intended to kill Mr. Edwards "after the exercise of reflection and judgment. " *Id.*

The element of premeditation is a question of fact for the jury. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). In *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004). The firing of multiple shots can allow a jury to infer premeditation. *State v. Halake*, 102 S.W.3d 661, 669 (Tenn. Crim. App. 2001) ("Additionally, in the instant case the victim was shot multiple times, which although not indicative of premeditation when considered by itself, can be considered as evidence of premeditation in addition to other proof of premeditation.").

The evidence, viewed in the light most favorable to the State, showed that the Defendant had a longstanding disagreement with Mr. Edwards's cousin. The Defendant prepared for his trip into the Klondike area by putting an SKS rifle in the back of his car. He followed behind Mr. Edwards for a short distance and later parked near where Mr. Edwards sat in his vehicle with Mr. Hardy. The Defendant exited his vehicle, pulled out the SKS rifle from the back of his car, and fired at the victims more than twenty times. Even as Mr. Edwards attempted to drive away, the Defendant followed the Hyundai with gunfire causing bullet holes that ran the length of the vehicle. After shooting at the victims, the Defendant fled, and disposed of his gun and the car. The Defendant shot and killed Mr. Hardy and severely injured Mr. Edwards. Based upon this evidence, a rational jury could find that the Defendant had a motive, took an SKS rifle with him in preparation for the confrontation, inflicted multiple wounds on both of the victims, disposed of evidence following the shooting, and fired more than twenty times at Mr. Edwards's vehicle. These are all factors that support a finding of premeditation.

The Defendant claims that his testimony that he intended to resolve the "feud" peacefully was proof that he did not intend to kill Mr. Hardy or Mr. Edwards. The evidence, however, contradicts this assertion. The Defendant armed himself with an SKS rifle before going to the area where he found Mr. Edwards and approached the victims with the rifle and fired at the men more than twenty times. This evidence belies the assertion that his intent was to peacefully approach the men and resolve the long-standing hostility.

As to the Defendant's claim that he cannot be convicted because he acted in self-defense, we note that self-defense is a fact question for the jury. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within the prerogative of the jury to reject a claim of self-defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). The jury heard the Defendant testify that he approached the victims seeking a peaceful resolution. By its verdict, the jury rejected the Defendant's explanation for exiting his car with an SKS rifle and repeatedly firing at the victims.

Accordingly, we conclude that there is sufficient evidence that the Defendant acted intentionally and with premeditation when he shot and killed Mr. Hardy and attempted to kill Mr. Edwards causing him severe injury. He is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE